

## Fourth Court of Appeals
### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-22-00484-CV

**ESTATE OF** Glenn Edward **TURPIN**, Deceased

From the Probate Court No. 2, Bexar County, Texas
Trial Court No. 2021-PC-0972
Honorable Veronica Vasquez, Judge Presiding

Opinion by:     Lori I. Valenzuela, Justice

Sitting:          Rebeca C. Martinez, Chief Justice
                 Irene Rios, Justice
                 Lori I. Valenzuela, Justice

Delivered and Filed: July 19, 2023

REVERSED AND REMANDED

Appellant, Glenda Gail Friesenhahn, appeals from an order granting appellee, Mary Louise May's motion to remove Friesenhahn as the independent executrix of their father's estate. We reverse the trial court's order removing Friesenhahn as independent executrix and remand for further proceedings.

## BACKGROUND

Mary Allene and Glenn Edward Turpin were married from February 1961 until Mary's death on January 11, 2021. Glenn died six days after his wife, on January 17. Mary and Edward had two children, daughters, who are the appellant ("Friesenhahn") and appellee ("May") in this appeal.

In 2011, Mary and Edward executed wills leaving their estates first to each other and then to their daughters in equal shares. These wills named Friesenhahn as alternate independent executrix. On December 2, 2020, Mary executed a new will, which gave her estate to her two daughters to hold "in trust for the benefit of [Glenn.]" This will gave Friesenhahn and May "as Joint Trustees, full authority to carry into effect [Mary's] intentions concerning the care, maintenance, and upkeep of [Glenn] for and during the remainder of his life." Upon Glenn's death, the estate would pass to Friesenhahn and May in equal shares. The will named Friesenhahn and May as joint independent executrixes. Also on December 2, 2020, Mary and Glenn executed powers-of-attorney naming their daughters as joint attorneys-in-fact. The powers-of-attorney gave Friesenhahn and May all listed powers, including the power to act on behalf of their parents on "Banking and other Financial Institution Transactions (including FirstMark Credit Union and Wells Fargo Bank[.)]"

Prior to Glenn's death, various bank accounts—held by Mary and/or Glenn—were liquidated and approximately $332,284.83 from those accounts was deposited into a new account at Security State Bank & Trust ("SSB&T"), which was opened on December 18, 2020. Mary and Friesenhahn each signed the SSB&T agreement as "account owner." The checking account was a "multiple-party account with right of survivorship."

On April 19, 2021, Glenn's 2011 will was admitted to probate and Friesenhahn was appointed independent executrix. On August 20, 2021, approximately eight months after the SSB&T account was opened and almost four months after Friesenhahn was appointed independent executrix, May filed a motion to remove Friesenhahn as independent executrix and for an order directing Friesenhahn to deposit the SSB&T funds into the registry of the court. May later filed an amended motion to remove. She later also filed suit against Friesenhahn alleging various causes of action, including breach of fiduciary duty, constructive fraud, breach of contract, undue

influence, and unjust enrichment. These claims were all premised on the allegations regarding the SSB&T account. On December 17, 2021, Friesenhahn filed an Inventory, Appraisement, and List of Claims. The inventory listed, under "Cash in Banks," Mary's Wells Fargo IRA in the amount of $2,671.01. No other cash assets were listed.

Following a multi-day hearing on the motion to remove, the trial court signed an order removing Friesenhahn as independent executrix pending the contest. The court also signed an order appointing a temporary administrator pending the contest. In a single issue on appeal, Friesenhahn asserts the trial court erred by removing her because May failed to prove a statutory ground justifying removal.

## STANDARD OF REVIEW

We review an order removing an independent executor for an abuse of discretion. *In re Est. of Montemayor*, No. 04-14-00391-CV, 2015 WL 1875978, at *2 (Tex. App.—San Antonio Apr. 22, 2015, no pet.) (mem. op.). Under an abuse of discretion standard, "[o]ur review is not limited to evaluating the sufficiency of the evidence supporting the trial court's findings, 'rather, we make an independent inquiry of the entire record to determine if the court abused its discretion[.]'" *In re Est. of Perez–Muzza*, 446 S.W.3d 415, 419 (Tex. App.—San Antonio 2014, pet. denied) (citation omitted). "A court abuses its discretion when it acts arbitrarily, unreasonably, or without reference to guiding rules or principles." *Id.* "The court does not abuse its discretion if some evidence reasonably supports [its] decision." *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 211 (Tex. 2002).

## REMOVAL OF INDEPENDENT EXECUTRIX

Section 404.0035 of the Texas Estates Code provides an independent executor may be removed when "the independent executor becomes incapable of properly performing the independent executor's fiduciary duties due to a material conflict of interest." TEX. ESTATES CODE

§ 404.0035(b)(4). The executor-removal provision in section 404.0035 "gives interested parties a means of challenging questionable actions so that the estate will not suffer at the hands of a self-dealing, incapacitated, or incompetent executor." *Sklar v. Sklar*, 598 S.W.3d 810, 830 (Tex. App.—Houston [14th Dist.] 2020, no pet.) (Frost, C.J., dissenting). "To remove an executor, the law does not require a showing of damage, just improper action or compelling circumstances that would fall within the rubric of the statute." *Id.* The party seeking to have an independent executor removed has the burden of establishing a violation of the statute. *Kappus v. Kappus*, 284 S.W.3d 831, 835 (Tex. 2009). "Once a violation of one of [the statutory grounds] has been proven, the trial court has discretion to decide whether the violation warrants removal." *Id.*

## A.     May's Allegations & Testimony

In her motion to remove, May alleged her mother, upon discovering Friesenhahn did not include May as a co-party on the SSB&T account, contacted Friesenhahn and demanded that Friesenhahn add May to the account to effectuate Mary's testamentary intent that her daughters share equally upon the death of Glenn. Friesenhahn did not do so. After Glenn's death, Friesenhahn closed the SSB&T account and took possession of the funds. May asserted that had Friesenhahn done as asked by their mother, then the funds would have become an asset of Glenn's estate. May asserted Friesenhahn had a material conflict of interest and would not sue herself to set aside her collection of the disputed cash asset that was on hand at SSB&T as of the date of Mary's death. May also asserted Friesenhahn had a material conflict of interest with May, Glenn's estate, and Mary's estate "as evidenced by" the allegations made in May's first amended original petition.[1]

---

[1] In her motion to remove, May also made various other allegations, including that Friesenhahn called the police to recover a vehicle being driven by May, which May contended her mother gave her; Friesenhahn physically assaulted May; Friesenhahn's husband prevailed in a civil lawsuit he filed against May's son; Friesenhahn's mother-in-law did

At the hearing, May testified she moved in with her parents in 2009 to help care for them and she continues to live rent-free in the house, which is an asset of the estate. She said that in October 2020, she, her mother, and Friesenhahn discussed consolidating their parents' funds held at various financial institutions into a single account to make it easier for their mother to review one account statement as opposed to several. May said her father did not take part in these conversations because he had dementia. May explained, "[t]he whole discussion was to go and find out exactly how much money my mother had in every account and then consolidating it into one. Was it discussed on who was going to get what? No. My mom always said that we would always split everything." May said she tried unsuccessfully to set up two appointments to go to the banks with Friesenhahn and her mother to consolidate the accounts, but Friesenhahn always said she could not meet with them.

Following an argument with her mother and Friesenhahn, May moved out of her parents' home on December 14, 2020, but moved back in on December 26, 2020. She said that on December 17th her mother told her that she and Friesenhahn were going to consolidate the accounts, and on December 26th her mother told her about the SSB&T account. According to May, her mother did not know how the SSB&T account was set up. May said her mother called Friesenhahn the next day and told her, "Well, then the only thing I know to tell you to do is go take your name off because next week we are going to be going. You can come with us or not, but that will be your choice. [May] will be on the account." A few days later, Mary died. No one ever went to SSB&T to change the account.

---

not prevail in her civil lawsuit against May's son; Friesenhahn's daughter had May's son arrested for trespass; Friesenhahn's son had May's son arrested for assault; Friesenhahn filed an incomplete inventory; and although there was an agreement that May select certain personal property before an auction, she was not notified about the date of the auction.

May said that when Friesenhahn was first appointed executrix, May did not take any steps to oppose the appointment because she did not know that she could, and she had not yet retained an attorney.

**B.** **Consolidation of Bank Accounts**

At the hearing, several older bank account agreements were admitted into evidence. One was a November 15, 2001, payable-on-death account agreement signed by Mary and Glenn as account owners and naming Friesenhahn as beneficiary. The bank agreement for this account shows the bank's name as First National Bank; however, at the hearing, the parties refer to this bank as South Trust Bank. On April 20, 2021, Friesenhahn, as "beneficiary," withdrew from South Trust Bank the following amounts: $59,413.67 payable to herself and $10,000 payable to Glenn's estate.

Several FirstMark Credit Union account agreements, which appear to have been signed between 2005 and 2013, were also admitted into evidence. Two FirstMark account agreements show Mary and Glenn as joint owners and Friesenhahn as the payable-on-death beneficiary. Another FirstMark account was owned only by Glenn, and the agreement listed Mary as the payable-on-death beneficiary. Another FirstMark account agreement listed Mary, Glenn, and Friesenhahn as joint owners with right of survivorship and no payable-on-death beneficiary. Finally, another FirstMark account agreement listed Mary and Glenn as joint owners with right of survivorship and did not list a payable-on-death beneficiary.

The SSB&T account was opened on December 18, 2020. The account agreement indicates its "ownership type" as "multiple-party with right of survivorship." No one was named as a payable-on-death beneficiary. However, both Mary and Friesenhahn checked the box next to the following provision in the agreement:

**MULTIPLE-PARTY ACCOUNT WITH RIGHT OF SURVIVORSHIP.** The parties to the account own the account in proportion to the parties' net contributions to the account. The financial institution may pay any sum in [illegible] at any time. On the death of the party, the party's ownership of the account passes to the surviving parties.

A December 31, 2020, SSB&T account statement showed four deposits for a total of $332,284.83: three on December 18th for $571.78, $99,957.93, and $181,755.12; and one deposit on December 23rd for $50,000. The $181,755.12 deposited into the SSB&T account came from one of the FirstMark joint accounts owned by Mary and Glenn. Friesenhahn agreed that the $50,000 deposited into the SSB&T account came from her parents' joint account at South Trust and the $99,957.93 came from her parents' joint account at Wells Fargo.

## C. Friesenhahn's Testimony

Friesenhahn testified her mother closed the accounts held at the other banks; she was merely her mother's driver; she did not open the SSB&T account; she did not make any of the deposits into the SSB&T account; she did not act as her mother's agent; and her mother asked the bankers questions as well as gave the bankers instructions. Friesenhahn said that although her mother was not well-educated, Friesenhahn had no concerns about her mother's ability to conduct financial transactions in December 2020. She denied the alleged telephone call from her mother regarding changing the SSB&T account, saying the call "never took place." She also said she had no conversations with her mother after December 18th or with May about the accounts.

Friesenhahn said she did not know where the money came from that was deposited into the SSB&T account because her mother withdrew the money from the other accounts. Although Friesenhahn claimed she did not know where the money came from, she acknowledged her parents were joint owners with right of survivorship on certain accounts held at FirstMark Credit Union.[2]

---

[2] May later testified that Friesenhahn was with her parents when the FirstMark accounts were opened.

Friesenhahn testified she did not realize she was the payable-on-death beneficiary on the SSB&T account until after both her parents had died and she called the bank to freeze the account. She also did not know, until recently, that she was named on the accounts at the other financial institutions.

**D.      Other Witnesses**

Bonnie Blakemore testified she had known Mary and Glenn since 1971, and she talked to Mary about once a week. She spoke to Mary about three days before Mary died, and she said Mary was upset about certain paperwork she had signed, stating:

> Okay. I asked her how she was, and she said that she was a little upset, that she had been in town with [Friesenhahn] and had signed some papers at an attorney's office. And she said: Jackie, I didn't realize when I signed them what they were really saying, and I have now read them.
> And she says: And I think I need to have it changed, so on Monday, I'm going to go to the attorney's office and have this changed.
> And I says: Well, Allene – I says: you understand what you signed?
> And she says: I did not at the time. She says: But I do now.
> She says: And I'm really upset that [Friesenhahn] would have done this.
> And that is all she said.

When asked what Mary meant, Bonnie said the conversation "had to do with doing her will and [Friesenhahn] being on her checking account and not both [Friesenhahn and May]." Bonnie testified that Mary wanted both daughters on the account.

Glenn Faulkner testified that he was Mary's second cousin and he helped May take care of her father. He said that on December 31st, he was at the house with Mary and May, and Mary was "very upset" with Friesenhahn about things other than the SSB&T bank account. On January 5th, he was at the house with Mary and

> . . . Glenn was in the bed laying there, and [Mary] was calling [Friesenhahn] because [Mary] had found out some deals that went through with the checking accounts and bank accounts. And she was upset that [Friesenhahn] had put her name on the accounts, and she was telling her she wanted it changed as soon as she could.

And they were planning on going to get it changed the following week. That would have been, I think, on a Friday when that happened.

He said Mary was surprised because she did not know what was happening at the time. He said he was present when Mary spoke to Friesenhahn on the telephone and told Friesenhahn she wanted to change the account. He said Mary wanted her daughters to both be on the account and to share equally in everything.

## E.     Analysis

In this appeal, we must decide whether the trial court abused its discretion by ordering Friesenhahn's removal as executrix pursuant to subsection (4) of Estates Code section 404.0035(b), which allows for removal when "the independent executor becomes incapable of properly performing the independent executor's fiduciary duties due to a material conflict of interest." TEX. ESTATES CODE § 404.0035(b)(4). The "material conflict of interest" ground for removal was not added to section 404.0035's predecessor statute (Probate Code 149C) until 2011, and the Estates Code does not define "material conflict of interest." However, "material" has been defined as "having real importance or great consequences," or "of such a nature that knowledge of the item would affect a person's decision-making process; significant; essential." *Wolf Hollow I, L.P. v. El Paso Mktg., L.P.*, 472 S.W.3d 325, 335-36 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) (citations omitted). Regarding "fiduciary duties, "[a]n executor of an estate is a fiduciary of the estate's property and 'has a duty to protect the beneficiaries' interest by fair dealing in good faith with fidelity and integrity.'" *Montemayor*, 2015 WL 1875978, at *3 (citations omitted). "In addition, an executor's 'personal interests may not conflict with [her] fiduciary obligations to the estate.'" *Id.* (citation omitted).

There are few cases interpreting subsection (4); however, two cases—one pre-amendment and one post-amendment—discuss a conflict of interest in the context of an executor's removal

based on gross misconduct or gross mismanagement in the performance of the executor's duties.[3] In *Kappus*, one of the beneficiaries ("Sandra") claimed that by being a co-owner of an estate asset, the executor ("John") had a conflict of interest, and when John attempted to sell certain land and split the proceeds evenly, despite the estate being owed more than half the proceeds, that potential conflict became an actual conflict and harmed the estate. 284 S.W.3d at 835. Although Probate Code section 149C, in effect at the time, did not specifically include "conflict of interest" in those express terms, Sandra argued such a conflict could justify removal under subsections (2), (5), and (6) of section 149C.[4] The Supreme Court stated the appeal concerned "whether an independent executor's alleged conflict of interest—here, a good-faith dispute over the executor's percentage ownership of estate assets—requires his removal as a matter of law." *Id.* at 833. The Court noted that "Probate Code section 149C list[ed] several grounds for removing an executor, but 'conflict of interest' (either actual or potential) [was] not among them, and [the Court] refuse[d] to engraft such a test onto the statute." *Id.* Nevertheless, the Court considered the question of "whether a potential conflict of interest constitutes gross misconduct or gross mismanagement." *Id.* at 836.

In considering Sandra's "gross misconduct or gross mismanagement" allegations, the Court held that a "good-faith disagreement over the executor's ownership share in the estate is not enough, standing alone, to require removal under section 149C." *Id.* at 837. "The statute speaks of affirmative malfeasance, and an executor's mere assertion of a claim to estate property, or

---

[3] Former Probate Code section 149C and current Estates Code section 404.0035(b) contain the following same ground for removal: "the independent executor is proved to have been guilty of gross misconduct or gross mismanagement in the performance of the independent executor's duties."

[4] Former section 149C provided for removal if "(2) sufficient grounds appear to support belief that the independent executor has misapplied or embezzled, or that the independent executor is about to misapply or embezzle, all or any part of the property committed to the independent executor's care"; "(5) the independent executor is proved to have been guilty of gross misconduct or gross mismanagement in the performance of the independent executor's duties"; or "(6) the independent executor becomes an incapacitated person, or is sentenced to the penitentiary, or from any other cause becomes legally incapacitated from properly performing the independent executor's fiduciary duties."

difference of opinion over the value of such property, does not warrant removal." *Id.* "A potential conflict does not equal actual misconduct." *Id.*

The Court recognized "there may be scenarios where an executor's conflict of interest is so absolute as to constitute what the statute terms 'gross misconduct or gross mismanagement.'" *Id.* The Court then listed the following factors a trial court should consider when deciding whether an executor's conflict amounts to "gross misconduct or gross mismanagement": the size of the estate, the degree of actual harm to the estate, the executor's good faith in asserting a claim for estate property, the testator's knowledge of the conflict, and the executor's disclosure of the conflict. *Id.* at 837-38.

This court later applied these factors in *Montemayor*, wherein the trial court removed an executor based on evidence he lived in the house that was the primary estate asset, did not make good faith efforts to sell the house, did not make necessary repairs, and prevented the other beneficiaries from accessing the house. 2015 WL 1875978, *1-2. The executor also stated that he would live in the house until the day he died. The trial court determined he was guilty of gross mismanagement and was incapable of performing his fiduciary duties due to a material conflict of interest and thus removal was authorized under subsections (3) and (5)[5] of Estates Code section 404.0035(b). *Id.* at *2.[6]

On appeal, this court applied the *Kappus* factors and held that, based on the evidence, the probate court could have taken into consideration the following in deciding whether the executor had a conflict of interest amounting to gross misconduct or gross mismanagement: (1) the property was the sole asset of the estate; (2) the executor's actions were harming the estate by his continuing

---

[5] At the time *Montemayor* was decided, current subsection (4) was numbered subsection (5).
[6] Although this court discussed whether the executor had a conflict of interest, it did not do so under subsection (4). Instead, it considered whether the executor should be removed for gross misconduct or gross mismanagement under subsection (3). *See id,* at *4 n.3.

to live on the property rent-free and his allowing the property's condition to deteriorate; (3) given the terms of the decedent's will, the executor's statements that he was "going to keep the house" and live there until he died, and his actions consistent with those statements, were not in good faith; and (4) the decedent could not have known that the executor would create this conflict. *Id.* at \*4 (citing *Kappus*, 284 S.W.3d at 837-38). Accordingly, this court concluded the record supported the probate court's conclusion that the executor "engaged in gross misconduct or gross mismanagement because he breached his fiduciary duty to protect the beneficiaries' interest and allowed his personal interest to conflict with his fiduciary obligations." *Id.*

Unlike the appeal before us, neither *Kappus* nor *Montemayor* considered "material conflict of interest" as an independent ground for removal. Also, unlike here, both *Kappus* and *Montemayor* involved alleged wrongdoing by an executor that occurred *after* the executor's appointment. "[T]he grounds to *remove* an independent executor post-appointment are different from those to *disqualify* an executor pre-appointment." *Kappus*, 284 S.W.3d at 835 (emphasis in original); *see* TEX. ESTATES CODE § 304.003(5) ("A person is not qualified to serve as an executor or administrator if the person is . . . a person whom the court finds unsuitable."). In contrast to the "catch-all standard" of "a person whom the court finds unsuitable" contained in Estates Code section 304.003 "that confers broad trial-court discretion," section 404.0035 lists seven specific grounds for removal, "none quite as expansive as unsuitability." *Kappus*, 284 S.W.3d at 835.

Here, May's motion to remove is premised on her allegations regarding the SSB&T account and various other allegations, many of which amount to family dysfunction. Most of these complaints center on actions taken before Friesenhahn was appointed independent executrix. Based on these allegations, May had the burden to show Friesenhahn became "incapable of properly performing [her] fiduciary duties due to a material conflict of interest." TEX. ESTATES CODE § 404.0035(b)(4).

A case similar to the one before us is *Matter of Estate of Collins*, 638 S.W.3d 814 (Tex. App.—Tyler 2021, no pet.), which involved alleged wrongdoing by an executor that occurred before his appointment and involved withdrawals from a joint bank account. In *Collins*, a beneficiary ("Bailey"), alleged the executor ("Hobbs") in his individual capacity had misappropriated funds from a joint bank account at Southside Bank that Hobbs owned with the decedent when he withdrew substantially more than his net contributions to the account. *Id.* at 816. Bailey contended the withdrawals from this joint account were paid to Hobbs and his sole proprietorship after the decedent had suffered a major stroke and her husband had died. Bailey alleged Hobbs deposited the funds from the joint account into a separate checking account that was solely in Hobbs's name even though the joint account belonged to the parties in proportion to their net contributions. Bailey also alleged Hobbs contributed only $36,500 to the Southside Bank joint account, so "over $750,000 of the money taken from [d]ecedent's [Southside Bank] account by Hobbs legally belonged" only to decedent. *Id.* On appeal, Bailey asserted the trial court properly removed Hobbs as executor because Hobbs would not pursue any claim the decedent's estate might have against him, and because Hobbs was guilty of "gross misconduct and/or gross mismanagement."

On the other hand, Hobbs contended the decedent opened the Southside Bank multi-party account with right of survivorship with him on October 3, 1995, and that under the account's terms, upon the death of a party, the deceased party's ownership of the account passed to the surviving party. *Id.* Hobbs argued that although Bailey was named as the beneficiary of the joint account, the account "was not designated as a payable on death account." *Id.* According to Hobbs, the joint account was "non-testamentary and not subject to being probated." Hobbs further asserted that the probate assets of the estate had been disbursed, and "[n]o complaint or allegation has been

made with regard to any acts and/or omissions on the part of Hobbs in his capacity as the independent executor." *Id.*

The Southside Bank records indicated the account was a multiple-party account with right of survivorship, owned by the decedent and Hobbs, and Bailey was listed as the beneficiary. *Id.* at 816-17. The account terms and conditions stated that "[o]n the death of a party, the party's ownership of the account passe[d] to the surviving parties." The account did not have a payable on death designation. The terms and conditions also provided that with respect to a multiple-party account with right of survivorship, "[t]he parties to the account own the account in proportion to the parties' net contributions to the account[,]" and the bank "may pay any sum in the account to a party at any time." *Id.* at 817.

On appeal, the court noted that "[o]wnership of funds held in a multiple[-]party account after the death of a party is determined by statute." *Id.* at 819 (quoting *Hare v. Longstreet*, 531 S.W.3d 922, 925 (Tex. App.—Tyler 2017, no pet.)). Under Estates Code section 113.151, "[s]ums remaining on deposit on the death of a party to a joint account belong to the surviving party or parties against the estate of the deceased party if the interest of the deceased party is made to survive to the surviving party or parties by a written agreement signed by the party who dies." TEX. ESTATES CODE § 113.151(a). The Estates Code provides that transfers resulting from the application of section 113.151 "are effective by reason of the account contracts involved and . . . are not to be considered testamentary transfers or subject to the testamentary provisions of this title." TEX. ESTATES CODE § 113.158.

The court held that, "[a]ll of Bailey's contentions involve the multiple-party account with right of survivorship." 638 S.W.3d at 820. "The signature card and terms and conditions of the account indicate that the account was created as a multiple-party account with right of survivorship, and that upon the death of one party, the deceased party's ownership of the account

would pass to the other party." *Id.* The court concluded that, "under the Texas Estates Code, the account was non-testamentary, and the funds passed to Hobbs pursuant to the account contract." *Id.* (citing TEX. ESTATES CODE § 113.158). "Furthermore, because the account was non-testamentary and Hobbs and the decedent had equal rights to the funds in the account during decedent's lifetime, there was no evidence that Hobbs either (1) engaged in gross misconduct or gross mismanagement in the performance of his duties as executor or (2) was incapable of properly performing his fiduciary duties due to a material conflict of interest." *Id.* (citing TEX. ESTATES CODE § 404.0035(b)(2), (4)). The court concluded Bailey failed to meet his burden of establishing a violation of the statute, and the trial court therefore abused its discretion by removing Hobbs. *Id.*

Here, May asserted Friesenhahn should be removed under subsection (4) of Estates Code section 404.0035(b) because Friesenhahn had a material conflict of interest for two reasons: (1) Friesenhahn would not sue herself to set aside her collection of the disputed cash asset that was on hand at SSB&T as of the date of Mary's death, and (2) Friesenhahn had a material conflict of interest with May, Glenn's estate, and Mary's estate "as evidenced by" the allegations made in May's first amended original petition. We conclude, on this record, that the trial court erred by removing Friesenhahn as independent executrix for either reason.

Friesenhahn withdrew the money from the SSB&T account, which under the Estates Code was non-testamentary and the funds passed to her pursuant to the account contract. Furthermore, Friesenhahn's alleged wrongdoing with regard to the SSB&T account occurred before her appointment as independent executrix and there is no evidence that, after her appointment, she was incapable of properly performing her fiduciary duties due to a material conflict of interest. As to May's argument that Friesenhahn had a material conflict of interest and would not sue herself to set aside her collection of the disputed cash asset that was on hand at SSB&T as of the date of Mary's death, the *Kappus* Court noted that "[t]he Legislature has provided that creditors of the

deceased can be granted letters of administration." 284 S.W.3d at 837; *see* TEX. ESTATES CODE § 304.001(a)(6) ("The court shall grant letters testamentary or of administration to persons qualified to act, in the following order . . . (6) a creditor of the decedent . . ..").

The Court held that "[s]uch creditors, by their very nature, have a conflict of interest by virtue of a claim against estate assets." 284 S.W.3d at 837. "Similarly, it is common for testators in Texas to name spouses (or business partners) [or their children] as independent executors." *Id.* "If we judicially amended [former] section 149C by declaring a per se removal rule for 'conflict of interest' whenever spouse-executors have a shared interest in community property, and issues arise over the separate or community character of estate assets, the surviving spouse could be ousted." *Id.* The Court noted that, although Sandra argued removal would only be justified when the executor actually asserted a claim adverse to the estate, "it seems under her theory that once a beneficiary objects to an executor's proposed valuation and distribution of property, the executor's defense would constitute a conflict of interest that mandates removal." *Id.* "Such a rule, besides having no statutory anchor in the text of [former] section 149C, would undermine the ability of Texas testators to name their own independent executor and also weaken the ability of an executor 'free of judicial supervision, to effect the distribution of an estate with a minimum of cost and delay.'" *Id.* "And it would impose this extra-statutory restriction even if the testator was fully aware of the potential conflict when the executor was chosen." *Id.*

Similarly here, the evidence established that Mary and Glenn named Friesenhahn as the sole payable-on-death beneficiary on some of their accounts as early as 2005, and there is no evidence in this record that they were not fully aware of a potential conflict when they named Friesenhahn as an independent executrix in their wills. Furthermore, we decline to declare a per se removal rule for "conflict of interest" that whenever a decedent and his child-executor have a

shared interest in property, and issues arise over the character of estate assets, the child named as executor could be ousted. *See id.*

Regarding May's allegation that Friesenhahn had a material conflict of interest with May, Glenn's estate, and Mary's estate "as evidenced by" the allegations made in May's first amended original petition, Friesenhahn's defenses to these allegations do not—on this record—constitute a material conflict of interest that mandates removal under section 404.0035(b)(4). Finally, although the record reveals family dysfunction, we cannot say this record supports a "material" conflict of interest on Friesenhahn's part that would prevent her from properly performing her fiduciary duties.

## CONCLUSION

On this record, we conclude May did not carry her burden of establishing a violation of the statute governing removal of an independent executrix. Therefore, the trial court erred by ordering Friesenhahn's removal. Accordingly, we reverse the trial court's July 15, 2022 "Order Granting Removal of Independent Executor Pending Contest," and remand this cause to the trial court for further proceedings consistent with this opinion.

Lori I. Valenzuela, Justice